AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)* )<br>the residence of )<br>16161 NW 83rd Pl, Miami Lakes, FL 33016, )<br>as described in Attachment A. ) | Case No. 25-MJ-3161-LETT |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____Florida_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute & Possess with Intent to Distribute a Controlled Substance |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Ethan Paszko, Special Agent, FBI
Printed name and title   Credential # 102502

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___Telephone___ *(specify reliable electronic means)*.

_____
Judge's signature

Date: June 10, 2025

City and state: Miami, FL

Honorable Enjolique A. Lett, United States Magistrate Judge
Printed name and title

EXHIBIT B

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Ethan Paszko, being duly sworn, do hereby state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since April 2023. I am currently assigned to the FBI Miami Division and the South Florida High Intensity Drug Trafficking Area ("HIDTA") Task Force. I have participated in multiple narcotics investigations and arrests for violations of Title 21, United States Code. These investigations have involved debriefing defendants, witnesses, and informants, conducting surveillance, assisting in court-ordered interceptions, executing search warrants, seizing narcotics, and making arrests for narcotics-related offenses. I am familiar with the methods of use, effects, distribution, appearance, and methods of manufacture and transportation of controlled substances.

2. As set forth in more detail below, I have probable cause to believe that Raimundo Roca ("ROCA") committed violations of federal law, including Conspiracy to Distribute a Controlled Substance and Possession with the Intent to Distribute a Controlled Substance in violation of Title 21, United States Code, Sections 846 and 841, respectively ("TARGET OFFENSES").

3. I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search ROCA's residence located at 16161 NW 83rd Place, Miami, Lakes, Florida 33016 ("TARGET RESIDENCE"), including the curtilage, garage, and any sheds or outbuildings of the TARGET RESIDENCE, and any electronic devices[1] located

---

[1] "Electronic Devices" are defined as any electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, including electronic mobile devices (such as cellular telephones, smartphones, tablets, electronic notebooks). This also includes data storage devices, that are magnetic, optical, and

1

therein, as more fully described in Attachment A, to seize instrumentalities, contraband, and evidence of the TARGET OFFENSES, as more fully described in Attachment B.

4. The facts in this affidavit come from my personal observations of this investigation, my training and experience, and most significantly, information intercepted on multiple target subject phone lines pursuant to an active Title III wiretap investigation, as explained below. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5. Beginning in or around December 2024, law enforcement initiated an investigation into the drug trafficking activities of BIENVENIDO Rodriguez ("BIENVENIDO") and his associates in South Florida and elsewhere. During this investigation, BIENVENIDO was identified as a member of a South Florida drug trafficking organization ("DTO") and a distributor of cocaine.

6. From January 15, 2025, to present day, law enforcement received judicial authorization from a federal judge to intercept telephone calls from a cellular device associated with BIENVENIDO.[2]

7. On or around May 20-21, 2025, law enforcement intercepted pertinent phone calls between BIENVENIDO and multiple target subjects for the wire to include Claudio BARRIOS ("BARRIOS"), Pedro GONZALEZ ("GONZALEZ"), ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓) and ROCA, related to the distribution of a drug shipment. On May 20, 2025, at approximately 7:22

---

electronic storage media (such as fixed disks, internal and external hard drives, CDs and DVDs, flash memory cards, thumb drives, SIM cards, and other internal and peripheral magnetic, optical, and electrical storage devices) capable of storing information. Electronic Devices specifically includes the DEVICE, as defined herein.

[2] SDFL docket numbers 1:25-WT-20002-KMM and 1:25-WT-20005-KMM.

2

p.m., in an intercepted call between BIENVENIDO and BARRIOS, BIENVENIDO instructs BARRIOS to be there at eight o'clock and that it will be "double" and "200 less." Then, at approximately 8:22 p.m., law enforcement intercepted a phone call between GONZALEZ and BIENVENIDO related to something that they could do the next day that would greatly interest GONZALEZ. At approximately 8:31 p.m., law enforcement intercepted a phone call between BIENVENIDO and ▮▮▮▮. ▮▮▮▮ told BIENVENIDO that he "caged the roosters already."

8. The next day, on May 21, 2025, law enforcement conducted surveillance of BIENVENIDO's residence, which is located at 6150 Tamiami Canal Road, Miami, FL 33126 ("BIENVENIDO RESIDENCE"). At approximately 7:31 a.m., BIENVENIDO arrived at his residence in his white Ford van bearing the Florida license plate 23EQAW and briefly entered the home. Minutes later, BIENVENIDO left the residence on foot and entered the passenger seat of a blue Chevrolet Trax, driven by GONZALEZ. GONZALEZ subsequently drove away with BIENVENIDO in the car.

9. Law enforcement followed GONZALEZ's car to 220 NW 65th Avenue, Miami, FL 33126 and observed GONZALEZ park the car at that location. A few minutes later, law enforcement observed a black Ford Mustang bearing the Florida license plate ▮▮▮▮ ("MUSTANG") arrive at the location and park the MUSTANG near the car GONZALEZ and BIENVENIDO were occupying. Once the MUSTANG parked, law enforcement observed BIENVENIDO exit GONZALEZ's car, walk towards the MUSTANG, remove a large black bag from the trunk of the MUSTANG, and hand the large black bag to GONZALEZ. GONZALEZ then placed the large black bag inside a separate 2009 white Ford van that was located nearby and

3

registered to GONZALEZ. After this exchange, BIENVENIDO entered the MUSTANG, which subsequently drove BIENVENIDO to the BIENVENIDO RESIDENCE and dropped him off.

10. Later that same day, on May 21, 2025, at approximately 11:55 a.m., a phone number previously known by law enforcement agents through the investigation to be associated to **ROCA** called BIENVENIDO and arranged a time to meet in person. At approximately 1:54 p.m., **ROCA** called BIENVENIDO and told him that he would arrive at the BIENVENIDO RESIDENCE in about 15 minutes. After 15 minutes, law enforcement observed a 2024 gray BMW i7 bearing Florida license plate DI33FF ("BMW i7") arrive and park in front of BIENVENIDO's RESIDENCE. Law enforcement learned that the BMW i7 is registered to **ROCA**'s brother. After the BMW i7 parked, law enforcement observed **ROCA** exit the vehicle empty handed, pull out his cell phone, and approach the main entrance to the BIENVENIDO RESIDENCE. **ROCA** sat down in a chair on the front porch. Seconds later, BIENVENIDO exited the front door of the BIENVENIDO RESIDENCE and handed **ROCA** a dark colored satchel bag. BIENVENIDO sat next to **ROCA** and the two engaged in a 25-minute conversation. After being handed the satchel and conversing with BIENVENIDO, **ROCA** stood up from the chair, entered the BMW i7 with the satchel bag, and left the BIENVENIDO RESIDENCE.

[remainder of page intentionally left blank]

4

11. The following are photographs which show **ROCA** arriving to the BIENVENIDO RESIDENCE empty handed, and leaving it with a dark colored satchel bag, believed to contain narcotics or narcotics proceeds:



*Roca arrives to 6150 Tamiami Canal Road on May 21, 2025, at 2:09 p.m., empty handed.*



*Roca departs from the residence at 2:35 p.m., carrying a satchel bag in his left arm.*

12. After leaving the BIENVENIDO RESIDENCE with the satchel bag, **ROCA** did not make any stops and drove directly to the **TARGET RESIDENCE**, parked and exited the vehicle, and began walking towards the **TARGET RESIDENCE**. As **ROCA** was walking towards the

5

**TARGET RESIDENCE**, law enforcement observed him holding an object in his arm but could not confirm if the object was the same satchel that he had received from BIENVENIDO earlier that day.

13.  While law enforcement cannot confirm that the object **ROCA** carried inside the **TARGET RESIDENCE** was the satchel BIENVENIDO provided him, the nature of the interaction between BIENVENIDO and **ROCA**—an in-person handoff, the use of a satchel bag consistent with the transport of narcotics or bulk U.S. currency, and **ROCA**'s direct and uninterrupted return to his home—strongly supports the conclusion that the satchel contained narcotics or drug proceeds. Further, based on my training and experience, drug traffickers avoid maintaining contraband in vehicles for extended periods and instead deliver it promptly to secure stash locations, often within their own residences, for processing, repackaging, or short-term storage.

14.  On May 25, 2025, law enforcement intercepted a phone call between BIENVENIDO and **ROCA**. During the call, BIENVENIDO advised **ROCA** that he was informed by "his buddy" that "family is coming, crossed" and referenced "black, yellow, and green," while noting that "the family is different." **ROCA** told BIENVENIDO not to worry. Based on my training and experience, the use of the term "crossed" is commonly understood in drug trafficking investigations to refer to narcotics or couriers having successfully crossed the U.S. border/entered the United States of America. The reference to "family" is believed to be coded language for drug shipments or transporters, while the mention of colors—black, yellow, and green—is consistent with methods used to differentiate between types, sources, or grades of narcotics, or to track quantities in a multi-package shipment. Based on my experience, I believe that this conversation, while brief, indicates that BIENVENIDO maintains a role in coordinating or receiving drug

6

shipments and has direct communication with sources or intermediaries involved in cross-border narcotics trafficking. Furthermore, **ROCA's** calm and knowledgeable response, and lack of any need for clarification, suggests that he is a trusted member of the distribution network.

15. On May 27, 2025, BIENVENIDO was arrested by law enforcement with 10 kilograms of cocaine while at 220 NW 65th Avenue, and intercepted communications between **ROCA** and BIENVENDIO ceased. However, drug traffickers, like **ROCA**, often have multiple suppliers in case one of their suppliers gets arrested or is unable to deliver narcotics. This is also true for drug traffickers having multiple buyers. Therefore, I believe **ROCA** is still engaging in drug trafficking.

16. Based upon my training and experience, as well as the knowledge and experience of other agents and law enforcement officers in my office with whom I have spoken, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences. Further, it is generally a common practice for drug traffickers to maintain in their residences, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

17. In addition, during such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in the residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

18. It is also a generally common practice for traffickers to conceal at their residences, large sums of money, either the proceeds from drug sales, or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

19. Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

20. Based on my training and experience, and consultation with other law enforcement agents who have experience in narcotics trafficking, I know that:

    a. Drug traffickers maintain books, records, receipts, notes, ledgers, and other papers relating to the procurement, distribution, storage, and transportation of controlled substances. These documents include, but are not limited to, records showing the phone numbers of customers, the beeper numbers of customers, the amount of controlled substances "fronted" to various customers along with running totals of debts to customers. Drug traffickers frequently maintain receipts such as credit card billings, parking stubs,

8

hotel reservations/records, airline tickets, gas receipts, and various notes. Items used to package controlled substances are also frequently maintained by drug traffickers.

b.  Individuals involved in the sale and distribution of narcotics and dangerous drugs generate large amounts of United States currency. These individuals attempt to conceal substantial portions of their earnings from the sale and distribution of narcotics from the Internal Revenue Service and other governmental authorities.

c.  Drug traffickers must maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing drug business.

d.  It is common in the purchasing, selling, and distribution of controlled substances for drug traffickers to "front" drugs (providing narcotics on consignment) to several clients causing large debts to be incurred. Often times these drugs/debts are paid for in installments over a period of time and involve large amounts of currency changing hands. Because of the large amounts of drugs and debts involved, and to prevent discrepancies, it is necessary for drug traffickers to maintain records such as, but not limited to, papers, notes, ledgers, journals, and logs. Frequently, these records are kept and concealed where the traffickers have ready access to them, i.e., homes, offices, and safes.

e.  Drug traffickers commonly maintain address books and/or telephone numbers in books or papers that reflect the names, addresses, pager number(s) and/or telephone numbers for their criminal associates in the drug trafficking organization, even if said items are in code. It is common for drug traffickers to conceal narcotics records, narcotics proceeds, and other related items described above within their residences, garages, safety deposit box(es), businesses, and automobiles so that they may have ready access to these items.

f. Drug traffickers often keep handguns, assault rifles, ammunition, and other weapons in their residences, businesses, automobiles, and storage units to safeguard supplies of drugs and the fruits of narcotics dealings.

21. I know that drug traffickers will often use multiple electronic devices and computer applications to communicate with buyers and sellers. The nature of the business requires that individuals meet at locations, often in public places and communicated shortly before the meeting takes place. In addition, a common counter-surveillance is to change locations at the last minute. Because cellular phones are a necessity to facilitate transactions in this context, drug traffickers will often have multiple devices that they periodically discard ("burner phones") and multiple methods of communications via computer applications, such as WhatsApp, Signal, and other similar programs.

[remainder of page intentionally left blank]

## CONCLUSION

22. Based on the foregoing, I submit that there is probable cause to believe that **ROCA** violated the TARGET OFFENSES and that evidence of the TARGET OFFENSES, including controlled substances, drug proceeds, and tools of the trade, will be found at the **TARGET RESIDENCE**. I respectfully request that the Court authorize a search of the **TARGET RESIDENCE**, more particularly described in Attachment A, to seize the items set forth in Attachment B.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
ETHAN PASZKO
SPECIAL AGENT  Credential # 102502
FEDERAL BUREAU OF INVESTIGATION

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Telephone this 10th day of June 2025.

_____
HONORABLE ENJOLIQUÉ A. LETT
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to be Searched*

The property to be searched is 16161 NW 83rd Pl, Miami Lakes, FL 33016. The location is a 3,554 square foot house on a 10,628 square foot lot with 4 bedrooms and 3 bathrooms and attached two car garage, including the curtilage of the residence, and any outbuildings and sheds. The numbers 16161 are displayed in large, visible numbers on the front of the house. In addition to the target residence/property, ~~all vehicles located on the premises at the time of the search that are owned, controlled, or used by the occupants of the premises~~ [EPM]. The vehicles known to be on the premises that are owned, controlled, or used by the occupants are a: (1) 2025 gray Land Rover, Florida license plate DI44BK; and (2) 2024 gray BMW i7, Florida license plate DI33FF. A photo of the **TARGET RESIDENCE** with the aforementioned vehicles is below:

Page 1 of 2



Page 2 of 2

## ATTACHMENT B

*Property to be Seized*

1. The following items, located at the **TARGET RESIDENCE**, which constitute evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841 and 846 (possession with intent to distribute and conspiracy to distribute controlled substances), including:

   a) Controlled substances, to wit: cocaine, methamphetamines, heroin, fentanyl, and other Schedule I and II narcotics held in violation of 21 U.S.C. § 841(a)(1);

   b) Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, for example: scales, funnels, sifters, grinders, shipping boxes, glass panes, mirrors, razor blades, plastic bags, heat-sealing devices, and dilutants such as mannitol, mannite, vitamin B12, etc.;

   c) Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

   d) Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

   e) Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, to-wit: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc.;

f) Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

g) Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car rental statements; rent or lease agreements, storage facility contracts, utility bills, or other documents demonstrating control over the premises; and papers relating to domestic and international travel;

h) Computers, computer media, cellphones, smartphones, or electronic storage devices that are attributable to **ROCA**; and

i) Records and information relating to the identity or location of the suspects in the drug trafficking organization.